## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **RANDAL QURAN REID**, | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION FILE NO:** |
| | ) | _____ |
| v. | ) | |
| | ) | |
| **ANDREW BARTHOLOMEW**, in his | ) | |
| Individual Capacity as a Deputy of the | ) | |
| Jefferson Parish Sheriff's Office, and | ) | |
| **JOSEPH P. LOPINTO III**, in his | ) | |
| Individual and Official Capacity | ) | *Jury Trial Demanded* |
| as Sheriff of the Jefferson Parish | ) | |
| Sheriff's Office, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT FOR DAMAGES

**NOW COMES** Plaintiff, RANDAL QURAN REID, and hereby files his *Complaint for Damages* against Defendant ANDREW BARTHOLOMEW, in his individual capacity as a deputy sheriff with the Jefferson Parish Sheriff's Office, and Defendant JOSEPH P. LOPINTO III., in his individual and official capacity as Sheriff of Jefferson Parish, and show this Court as follows:

## **INTRODUCTION**

### 1.

This is a civil rights lawsuit filed by RANDAL QURAN RIED seeking general and compensatory damages for his wrongful arrest and imprisonment, in violation of his rights guaranteed by the Fourth Amendment to the United States Constitution. MR. REID who was arrested and held without bond for six (6) days based on a criminal arrest warrant that falsely identified him as a suspect for the felony crimes of bank fraud and identity theft.[1] MR. REID'S arrest and incarceration resulted from Defendants' misuse and reliance on facial recognition technology that incorrectly identified him as a suspect in the theft of high-end purses from a consignment store in Metairie, Louisiana.

### 2.

Mr. REID is a resident of Georgia and has never been to Louisiana. He was arrested in Dekalb County, Georgia, based on the unconstitutional actions of the Jefferson Parish Sheriff's Office, including Defendant BARTHOLOMEW, who wrongfully secured a warrant for MR. REID'S arrest and extradition based on false

---

[1] *See* Kashmir Hill & Ryan Mac, *Thousands of Dollars for Something I Didn't Do*, N.Y. TIMES (Mar. 31, 2023), https://www.nytimes.com/2023/03/31/technology/facial-recognition-false-arrests.html; Jon Brodkin, *Black Man Wrongfully Jailed for a Week After Face Recognition Error, Report Says*, Ars Technica (Jan. 4, 2023), https://www.arstechnica.com/2023/01/facial-recognition-error-led-to-wrongful-arrest-of-black-man-report-says.html. *See* John Simerman, *JPSO Used Facial Recognition*, THE TIMES-PICAYUNE (Jan. 2, 2023), https://www.nola.com/news/crime_police/jpso-used-facial-recognition-to-arrest-a-man-it-was-wrong/article_0818361a-8886-11ed-8119-93b98ecccc8d.html.

and misleading information submitted to a magistrate, which failed to reveal that facial recognition technology was the only source of MR. REID'S identification. Defendant BARTHOLOMEW knowingly and recklessly misrepresented and omitted information from his criminal arrest warrant affidavit that was material to the magistrate's decision to issue an arrest warrant for MR. REID.

3.

MR. REID'S false identification, arrest, imprisonment, and subsequent exoneration exemplifies the grave harm caused by the misuse and reliance on facial recognition technology.[2] Even when used under the best possible circumstances, facial recognition technology is extremely flawed and unreliable, particularly when attempting to identify African Americans.[3] While facial recognition can be a legitimate investigative tool for law enforcement, an identification based solely on facial recognition technology does not provide probable cause for an arrest.

---

[2] See Robert Julian-Borchak Williams v. City of Detroit, et al., E.D. Mich., 2:21-cv-10827-GAD. This case involves claims against the City of Detroit, the Detroit Police Chief and Detective Donald Bussa, for wrongful arrest and imprisonment based on the misuse of, and reliance upon, facial recognition technology which incorrectly identified Mr. Williams as a possible match for a crime.

[3] See Patrick Grother et al., Ongoing Face Recognition Vendor Test (FVRT) Part 2: Identification, Nat. Inst. of Standards & Tech. 8271 (2019); Pei Li et. al, Face Recognition in Low Quality Images: A Survey, ACM Computer Survey 1 (2019); Jacqueline G. Cavazos et al., Accuracy Comparison Across Face Recognition Algorithms: Where Are We on Measuring Race Bias, 3 IEEE Transactions on Biometrics, Behavior, and Identity Science 1, 101 (2021).

4.

Responsible law enforcement agencies that use and rely on facial recognition technology have policies and procedures that define and limit the use of this technology. As stated in the New York City Police Department's (NYPD) patrol section policy on "Facial Recognition Technology" –

> Facial recognition technology enhances the ability to investigate criminal activity and increase public safety. The Facial recognition process does not by itself establish probable cause to arrest or obtain a search warrant, but it may generate investigative leads through a combination of automated biometric comparisons and human analysis.

*NYPD, Patrol Guide, Command Operations, Procedure 212-129, March 12, 2020, Facial Recognition Technology*, attached hereto as **Exhibit 1**. Similarly, the New Orleans Police Department (NOPD) has policies and procedures governing the of facial recognition technology. These policies and procedures include safeguards and protocols relating to an officer's request to use facial recognition technology, and analysis of facial recognition submissions.

> The safeguards and protocols built into this policy for the use of facial recognition technology mitigate the risk of biased law enforcement. The NOPD facial recognition policy integrates human investigators in all phases. All possible facial recognition matches undergo a peer review by other facial recognition investigators. Further, the possible match report includes the submitted image, and notification stating that **the determination of a possible match candidate alone does not constitute probable cause to effect an arrest or obtain an arrest or search warrant, and that further**

**investigation is needed to establish probable cause**.

*New Orleans Police Department Operations Manual, Chapter 51.1.1, Use of Facial Recognition for Criminal Investigations*, POLICY STATEMENT, Para. 4, Page 1, attached hereto as **Exhibit 2**.  (emphasis in original)

5.

Based on information and belief, the facial recognition software used by the Jefferson Parish Defendants was designed and manufactured by Clearview AI, Inc., a New York based company.[4]  Although ignored by Defendants, the guidelines provided by Clearview AI for use of its technology specifically warns users that "search results established through CV and its related systems and technologies are indicative and not definitive" and that "CV is neither designed nor intended to be used as a single-source system for establishing the identity of an individual." [5]   See *Clearview AI, Service Agreement, User Guidelines*, attached

---

[4] David C. Gray, *Bertillonage in an Age of Surveillance: Fourth Amendment regulation of Facial Recognition Technologies*, 24 SMU SCI. & TECH, L. REV. 3 (2021) ("One of the more prominent providers of facial recognition technologies to law enforcement in Clearview AI. Clearview scrapes the internet, social media, and even financial services sites – millions in total – to gather and provide images of faces. It then offers users the opportunity to use the Clearview app to match comparator images provided by a user with images from that massive database.  Clearview has hundreds of law enforcement agencies among its clients and has exploded in popularity. This is despite the fact that, unlike most technology companies in the facial recognition business, Clearview has not submitted its technology to the National Institute of Standards and Technology (NIST), which has been conducting independent assessments of facial recognition technologies since 2000." (footnotes and citations omitted).

[5] Center on Privacy & Technology at Georgetown Law, *The Perpetual Line-up: Unregulated Police Face Recognition in America* (https://www.perpetuallineup.org/). ("Companies and police departments largely rely on police officers to decide whether a candidate photo is in fact a match.  Yet a recent study showed that, without specialized training, human users make the wrong decision about a match half the time.  We found only eight face recognition systems where specialized personnel reviewed and narrowed down potential matches.  The training

hereto as **Exhibit 3**.

## **JURISDICTION AND VENUE**

6.

This action is brought pursuant to 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments of the United States Constitution as applied to the State of Louisiana and its entities, officials, and employees, as well as the statutes and common laws of the State of Louisiana.

7.

Because this is an action under the United States Constitution, this Court has jurisdiction under Article III of the Constitution and under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). The relief sought is authorized by the United States Constitution and by 42 U.S.C. § 1983.

8.

This Court has supplemental jurisdiction over MR. REID'S state law claims pursuant to 28 U.S.C. § 1367, because they are related to his §1983 claims, over which this Court has original jurisdiction, and these claims all arise from the same case or controversy under Article III of the United States Constitution.

9.

regime for examiners remains a work in progress.").

Venue is proper in the Northern District of Georgia, Atlanta Division pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and occurrences giving rise to the claim occurred in Dekalb County, Georgia.

10.

This court has "specific" personal jurisdiction over Defendants because their actions are intentional torts that caused MR. REID'S arrest and incarceration in the DeKalb County jail, giving rise to his cause of action for the violation of his state and federal statutory and constitutional rights.

11.

As shown herein, by executing a criminal arrest warrant for MR. REID, with a requirement that he be detained for extradition to Louisiana, Defendants purposefully availed themselves of the privilege of conducting activities within the state of Georgia, and within the jurisdiction of the United States District Court for the Northern District of Georgia.

12.

The actions of Defendants, as shown herein, are such that they should reasonably anticipate being haled into court in this jurisdiction to answer for their actions directed towards MR. REID, a Georgia resident. Moreover, allowing this case to proceed against Defendants in this jurisdiction does not offend traditional

notions of fair play and substantial justice.

## IDENTIFICATION OF PARTIES

13.

Plaintiff, RANDAL QURAN REID, at all relevant times herein, was a citizen of the United States and a resident of Georgia, residing at 5094 Panola Mill Road, Lithonia, Georgia 30038.  MR. REID brings this action under federal law and Louisiana law for all general, special, compensatory, and permissible damages.

14.

Defendant, ANDREW BARTHOLOMEW (hereinafter "Defendant BARTHOLOMEW"), at all relevant times herein, is and was a sworn deputy of the Jefferson Parish Sheriff's Office. In his capacity as a law enforcement officer, Defendant BARTHOLOMEW was responsible for policing Jefferson Parish under the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Louisiana and the Jefferson Parish Sheriff's Office.

15.

The actions of Defendant BARTHOLOMEW that are the subject of this lawsuit were undertaken in the regular course of his employment as a deputy with

the JPSO.  Defendant BARTHOLOMEW is sued in his individual capacity and is a resident and citizen of the State of Louisiana and may be served with process at his personal place of residence: 3205 Decomine Drive, Chalmette, Louisiana 70043. Jurisdiction and venue are proper.

16.

Defendant, JOSEPH P. LOPINTO III (hereinafter "Defendant LOPINTO") is, and at all relevant times, was the Sheriff of the Jefferson Parish Sheriff's Office (herein sometimes referred to as "JPSO"), with supervisory and managerial authority over all Jefferson Parish Sheriff's Office deputies. Under Louisiana law, the definition of a political subdivision includes a "sheriff." See La. Rev. Stat. § 13:5102(B). As such, Defendant LOPINTO may be sued in his official capacity as Sheriff of JPSO, as the chief law enforcement officer of Jefferson Parish who is authorized to perform governmental functions as a unit of local government.

17.

In his role as Sheriff, Defendant LOPINTO was ultimately responsible for the hiring, training, supervision, discipline, administration, policies, customs, practices, operations, management, and control of the JPSO and its officers, including Defendant BARTHOLOMEW. Under Louisiana and federal law, Defendant LOPINTO is and was the final policymaker for JPSO in the areas of law

enforcement and the employment and training, and supervision of JPSO officers. As such, Defendant LOPINTO can be held liable in his individual and official capacity for his actions as final policymaker over JPSO, including Defendant BARTHOLOMEW.

18.

As sheriff, Defendant LOPINTO is responsible for ensuring that JPSO deputies complied with the color and pretense of federal and state laws, as well as the ordinances, regulations, customs, usages of the State of Louisiana and Jefferson Parish, and the policies of JPSO.

19.

In his role as sheriff, Defendant LOPINTO was ultimately responsible for the polices, practices, customs, and regulations of JPSO; for the hiring, training, supervision, and discipline of JPSO officers; and for promulgating all orders, rules, instructions, and standard operating procedures for citizen encounters with police officers acting in their official capacity.

20.

The actions of Defendant LOPINTO that are the subject of this complaint were undertaken under the color of law in the regular course of his employment as sheriff of JPSO. Defendant LOPINTO is sued in his official and individual

capacity, as Sheriff of the Jefferson Parish Sheriff's Office.  Said Defendant is a resident and citizen of the State of Louisiana and may be served with process in his individual and official capacities at 1233 Westbank Expressway, Harvey, Louisiana 70058. Jurisdiction and venue are proper.

21.

The actions of Defendants violated clearly and established statutory and constitutional rights of which reasonable officers would have known, including rights pertaining to the Fourth Amendment of the United States Constitution relating to the standards governing the application for arrest warrants.

22.

The actions and omissions of Defendants towards MR. REID were willful, wanton, and reckless, and proximately caused injuries to MR. REID, for which Defendants are not entitled to immunity.

23.

Defendant LOPINTO, in his individual and official capacity as sheriff of the Jefferson Parish Sheriff's Office, has acted with deliberate indifference towards the constitutional rights of citizens to be free from unreasonable seizures in violation of the Fourth Amendment. Specifically, Defendant LOPINTO has failed to create and implement adequate policies, procedures, and training for JPSO deputies

regarding the appropriate use of facial recognition technology for investigative purposes, including for identification purposes in support of arrest warrants.

## STATEMENT OF FACTS

### 24.

On November 25, 2022, while driving to visit his mother to celebrate Thanksgiving, MR. REID was pulled over by officers with the Dekalb County Police Department, taken into custody, and detained at the Dekalb County Jail.

### 25.

At around 3:30 pm on November 25, 2022, Dekalb County Police Officer B.K. Anderson was on patrol conducting interstate enforcement on Interstate 20 east bound when he observed a white 2017 Jeep Grand Cherokee bearing Georgia tag CSV9467. See *Dekalb County Police Department, Incident Report*, Case #: 22-100059, Page 2 of 2, attached as **Exhibit 4**.

### 26.

Officer Anderson reports that a random GCIC/NCIC query of the vehicle tag informed him that the registered owner of the vehicle, MR. REID, was showing two active felony larceny warrants for his arrest with full extradition - one with the Jefferson Parish's Sheriff's Office and the second with the Baton Rouge Police Department, Louisiana WNO#6309522.  (*Id.*).

27.

Based on a photo of MR. REID on file with the Department of Driver Services (DDS), Officer Anderson determined that MR. REID was the person he observed driving the 2017 Jeep Grand Cherokee, which identified the owner as having outstanding felony warrants.  (*Id.*).

28.

According to Officer Anderson, he conducted a traffic stop of the 2017 Jeep Grand Cherokee, approached the vehicle, and through conversation with the driver of the vehicle, he determined that MR. REID was the same person identified in the GCIC/NCIC match for the person wanted for the outstanding warrants. (*Id.*).

29.

Throughout his detention on the scene, MR. REID asked officers why he was being detained and arrested. Four police vehicles were involved in pulling over and detaining MR. REID.

30.

When he learned the circumstances of why he was being detained, MR. REID was extremely puzzled about how he could have been identified for a crime in Jefferson Parish, Louisiana without having ever been to or through the state of Louisiana.

## ARREST OF RANDAL REID
## FOR BANK FRAUD

31.

MR. REID advised the Dekalb County police officers that the warrant was a mistake because he had never been to Jefferson Parish to no avail. Upon their confirmation of his warrants, the officers placed MR. REID under arrest.

32.

Officer Anderson removed MR. REID from his vehicle and placed him into custody with the assistance of Officer R. Mason, who had arrived on the scene along with other Dekalb County Police Department Officers to assist Officer Anderson. (*Id.*).

33.

Officer Anderson informed MR. REID that he was being placed under arrest and transported him to the DeKalb County jail for his booking and processing, based on two outstanding felony larceny warrants. (*Id.*).

34.

According to Officer Anderson, there were two outstanding warrants attached to MR. REID's driver's license, which he subsequently confirmed prior to

transporting MR. REID to the Dekalb County Jail to be detained and extradited. Following his arrest, MR. REID's vehicle was inventoried and towed away from the scene. (*Id.*).

35.

A second incident report prepared by Officer Chang of the Dekalb County Police Department, titled "ARREST/INCIDENT REPORT", identified MR. REID as a fugitive from justice arising from a larceny in Louisiana. See *Dekalb County Police Department, Arrest/Incident Report, Case Number 22S011-003901*, attached as **Exhibit 5**.

36.

Officer Chang's arrest/incident report states that MR. REID was arrested on a DeKalb County Warrant 22W018886, issued by Judge Taylor, charging him with being a fugitive from justice from Louisiana. (*Id.*).

37.

According to Officer Chang, MR. REID was taken before a Dekalb County Magistrate on November 29, 2022, where he agreed to and signed a waiver of extradition to Louisiana.

38.

Officer Chang's report, dated November 30, 2022, stated that MR. REID

was ready for pickup and the demanding state of Louisiana had been contacted. (*Id.*).

39.

Officer Chang prepared a criminal arrest warrant affidavit stating that MR. REID was a felony fugitive for justice in violation of the laws of the State of Georgia and that MR. REID was wanted for the charge of larceny from the State of Louisiana based on a warrant numbered F2185022.  See *Criminal Arrest Warrant Affidavit*, attached as **Exhibit 6**.

40.

Officer Chang's criminal arrest warrant affidavit for MR. REID was based on notice and documentation received by the DeKalb County Police Department from the Jefferson Parish Sheriff's Office stating, in part, as follows:

> PLEASE PLACE A HOLD ON THE ABOVE SUBJECT FOR THIS DEPARTMENTL, WE WILL EXTRADITE ON THIS MATTER. ADVISE WHEN THE SUBJECT SIGNS A WAIVER OF EXTRADITION OR IF HE REFUSES, WE WILL PROCEED TO A GOVERNOR'S WARRANT.

See *Document from Jefferson Parish Sheriff's Office, Extradition/Fugitive Section*, attached hereto as **Exhibit 7**.

41.

According to notice and documentation provided by JPSO to the DeKalb

County Police Department, MR. REID was wanted in Case Number F-21850-22 for the following felony crimes:  ten (10) counts of bank fraud, ten (10) counts of identity theft, and one (1) count of theft of more than $5,000 but less than 25,000. (*Id.*).

42.

On November 29, 2022, MR. REID appeared before the Magistrate Court of DeKalb County and agreed to a waiver of extradition to answer the charges against him from Jefferson Parish, even though he never visited either Jefferson Parish or the State of Louisiana. See *Waiver of Extradition*, attached hereto as **Exhibit 8**.

43.

On November 30, 2022, the Dekalb County Sheriff's Office notified the Jefferson Parish Sheriff's Office that MR. REID had waived extradition and was ready to be transported to Louisiana. See Dekalb County Sheriff's Office document to JPSO, attached hereto as **Exhibit 9**.

## INVESTIGATION BY
## JEFFERSON PARISH SHERIFF'S OFFICE

44.

On June 30, 2022, the storeowner of the Second Act consignment store, in Metairie, Louisiana, reported a theft that occurred on June 22 and June 23, 2022, involving four unknown African American individuals who entered the store and

purchased over $12,500 worth of designer purses with a stolen credit card. See *JPSO Crime Report*, attached hereto as **Exhibit 10**.

45.

Deputies McCubbins and Schiro from JPSO responded to Second Act and met with the owner, Pamela Baldassaro, who reported on June 22, 2022, that two unknown black males entered her store and purchased a black Chanel purse for $5,241.60 and a brown Luis Vuitton purse for $3,057.60 using a Mastercard. *Id.*, at Page 4.

46.

Ms. Baldassaro reported to Deputies McCubbins and Schiro that on June 23, 2022, that a different pair of two unknown black males entered her store and purchased a red Chanel purse for $4,586.40, and this item was also purchased with a Mastercard. *Id.*

47.

Ms. Baldassaro also reported that she was contacted by her bank and informed that charges for the above-referenced items were disputed by the owner of the MasterCard, and that Second Act would not be entitled to a refund. Ms. Baldassaro was able to confirm that the two MasterCard purchases described above, from June 22 and 23, 2022, were made using the same Mastercard. *Id.*

48.

Ms. Baldassaro was also informed by a digital merchant service, used by Second Act, that they would not refund the store for MasterCard purchases on either June 22 or 23, because the customer manually entered the credit card number that was not produced at the time of purchase for verification. *Id.*

49.

Ms. Baldassaro provided the deputies with store surveillance footage from June 22 and 23, along with the credit card receipts for the purchase, which allowed the deputies to confirm the details of the incident with the time frame provided by Ms. Baldassaro. *Id.*

50.

After watching the surveillance footage, Deputy McCubbins notified Sergeant Edward Urquhart of the incident, and Deputy Kaough, who arrived on the scene and collected a USB drive containing the video surveillance footage of the June 22 and 23 purchases, along with multiple declined credit card receipts and the approved transactions. *Id.*

## DETECTIVE BARTHOLOMEW'S
## AFFIDAVIT FOR ARREST WARRANTS

51.

On July 6, 2022, Defendant BARTHOLOMEW was assigned to conduct a follow-up investigation into the thefts at Second Act, based on the information and evidence forwarded to him from Deputy Kaough. See *JPSO, Economic Crimes Section, Incident Notification*, attached hereto as **Exhibit 11**.

52.

*JPSO Economic Crimes Section's Incident Notification* summarized the investigative activities of Defendant BARTHOLOMEW regarding the Second Act theft, as follows:

> Detective Andrew Bartholomew was assigned the investigation. Detective Bartholomew reviewed the surveillance video and was able to utilize still photographs from the video to identify three of the four suspects. These subjects were positively identified as Ashton Malik Johnson (B/M, DOB: 02/22/1999), Randal Quran Reid (B/M DOB: 02/09/1994), and Armando Jacob Williams (B/M, DOB: 03/23/2001). Detective Bartholomew obtained arrest warrants for these suspects and is continually attempting to identify the fourth suspect.

*Id.*, at Page 2.

## AFFIDAVIT FOR ARREST OF
## RANDAL QURAN REID

53.

On July 18, 2022, Defendant BARTHOLOMEW swore and signed an affidavit under penalty of perjury, declaring that the information contained within the affidavit was true and correct, as follows:

> I, Detective Andrew R Bartholomew, with the Jefferson Parish Sheriff's Office, certify under oath based on information outlined below, that there is probable cause to believe Randal Quran Reid on or about the date(s) of 06-22-2022 did commit:
>
> 10 Count(s) of 14:71.1 – BANK FRAUD – (Felony)
>
> 10 Counts of 14:67.16 C (1-3) – Identity Theft (Felony)
>
> 1 Count(s) of 14:67 B2 – Theft $5000 but less than 25k (Felony)

See *AFFIDAVIT FOR ARREST WARRANT*, Page 1, attached hereto as **Exhibit 12**.

54.

According to Defendant BARTHOLOMEW'S affidavit for the arrest of MR. REID, as part of his investigation he "reviewed the surveillance video and was able to utilize still photographs from the video to identify three of the four suspects." *Id.*, at Page 2.

55.

In his affidavit for the arrest of MR. REID, Defendant BARTHOLOMEW

wrote that "<u>he was advised by a credible source the heavyset black male from June 22, 2022, was Randal Reid</u>." *Id.* (emphasis added).

56.

Regarding MR. REID, Defendant BARTHOLOMEW's affidavit states that he "conducted a search of the name, which revealed a DMV photograph of a Randal Quran Reid (B/M, DOB: 02/09/1994), which appeared to match the description of the suspect from the surveillance video." *Id.*

57.

Based on the results of his investigation, Defendant BARTHOLOMEW requested an arrest warrant for MR. REID charging him with ten (10) counts of Identify Theft, ten (10) counts of Bank Fraud, and one (1) count of Theft of more than $5,000 but less than $25,000. *Id.*

58.

Defendant BARTHOLOMEW'S criminal arrest warrant for MR. REID was submitted to the 24th Judicial District Court of Jefferson Parish and signed by Judge Paul Schneider on July 18, 2022, at 4:28PM. <u>See</u> *Arrest Warrant*, attached hereto as **Exhibit 13**.

59.

Based on information and belief, Defendant BARTHOLOMEW'S

identification of MR. REID "led to a second warrant for his arrest in East Baton Rouge Parish, where, according to a police report, the man he resembled had used a stolen credit card to pay a $2,800 Chanel bag at another consignment store."[6] According to a spokesperson from the Baton Rouge Police Department, they "trusted the information" from JPSO, explaining that "What methods they used, we do not know." *Id.*

## AFFIDAVIT FOR ARREST OF ARMANDO JACOB WILLIAMS

60.

On July 19, 2022, as part of the same investigation that misidentified MR. REID, Defendant BARTHOLOMEW swore to a virtually identical criminal arrest warrant affidavit for **Armando Jacob Williams**. See *AFFIDAVIT FOR ARREST WARRANT*, Page 1, attached hereto as **Exhibit 14**.

61.

Regarding **Mr. Williams**, Defendant BARTHOLOMEW alleged that he "was advised by a credible source the black male clad in the dark shirt and yellow shoes from June 23, 2022, was Armando Williams." *Id.* (emphasis added).

62.

---

[6] See Kashmir Hill & Ryan Mac, *Thousands of Dollars for Something I Didn't Do*, N.Y. TIMES (Mar. 31, 2023), https://www.nytimes.com/2023/03/31/technology/facial-recognition-false-arrests.html.

Regarding **Mr. Williams**, Defendant BARTHOLOMEW'S affidavit states that he "conducted a search of the name, which revealed a DMV photograph of an Armando Jacob Williams (B/M, DOB: 03/23/2001), which appeared to match the description of the suspect from the video surveillance video." *Id.*

63.

An arrest warrant was issued for **Mr. Williams** and subsequently recalled. See *Arrest Warrant*, attached hereto as **Exhibit 15**, and *Recalled Warrant,* attached hereto as **Exhibit 16**.

## AFFIDAVIT FOR ARREST OF ASHTON MALIK JOHNSON

64.

On July 18, 2022, as part of the same investigation that misidentified MR. REID, Defendant BARTHOLOMEW swore to a virtual identical criminal arrest warrant affidavit for **Ashton Malik Johnson**. See *AFFIDAVIT FOR ARREST WARRANT*, Page 1, attached hereto as **Exhibit 17**.

65.

Regarding **Mr. Johnson**, Defendant BARTHOLOMEW alleged that he "was advised by a credible source, the heavyset black male from June 22, 2022, was Ashton Malik Johnson." *Id.* (emphasis added).

66.

24

Regarding **Mr. Johnson**, Defendant BARTHOLOMEW'S affidavit states that he "conducted a search of the name, which revealed a DMV photograph of an **Ashton Malik Johnson** (B/M, DOB: 02/22/1999), which appeared to match the description of the suspect from the video surveillance video." *Id.*

67.

An arrest warrant was issued for **Mr. Williams** and subsequently recalled. See *Arrest Warrant*, attached hereto as **Exhibit 18**, and *Recalled Warrant,* attached hereto as **Exhibit 19**.

## FAILURE TO DISCLOSE USE OF FACIAL RECOGNITION TECHNOLOGY TO OBTAIN IDENTIFICATIONS

68.

In 2019, JPSO entered a contract with Clearview AI, a facial recognition vendor. See *Clearview Ai Invoice*, attached hereto as **Exhibit 20**.

69.

Although not referenced in Defendant BARTHOLOMEW'S criminal arrest warrant affidavit for MR. REID, the Jefferson Parish Sheriff's Office used facial recognition technology to identify MR. REID. However, they failed to disclose this information in his criminal arrest warrant affidavit submitted to the magistrate.[7]

---

[7] *See* Kashmir, supra note 1.

70.

Any reasonable officer should have known that a magistrate considering whether to issue a warrant would need to know that the sole basis of the affidavit was an identification obtained with the use of facial recognition technology.

71.

Defendant BARTHOLOMEW did not conduct even a basic search into MR. REID, which would have revealed that MR. REID was in Georgia when the theft occurred and has never been to the state of Louisiana.

72.

Defendant BARTHOLOMEW'S warrant affidavit failed to disclose the fact that he relied exclusively on facial recognition technology. Instead, Defendant BARTHOLOMEW'S affidavit was intentionally misleading; it stated that MR. REID was identified as the suspect in the surveillance video by a "credible source" for whom no information was provided.

73.

Clearview AI describes its facial recognition technology as a "search engine of publicly available images" which pulls and compiles publicly available images from across the Internet into a proprietary image database to be used in combination with Clearview's facial recognition technology." See *Clearview*

*Unique Attributes*, attached hereto as **Exhibit 21**.

74.

Clearview AI proclaims that its technology "is unique in that it is the only facial identification service that is "turnkey" and includes its own searchable proprietary database." *Id.*

75.

Facial recognition systems are used to attempt to identify an individual by using an image of their face. It is well documented that facial recognition technology is deeply flawed and unreliable under the best of circumstances. This technology is especially unreliable when attempting to identify Black people. Facial recognition algorithms consistently misidentify Black people at far higher rates than white people.[8]

76.

For many years, researchers have understood that facial recognition systems are racially biased—Black individuals are up to *one hundred* times more likely to

---

[8] J.G. Cavazos et. al., *Accuracy Comparison Across Face Recognition Algorithms: Where Are We on Measuring Race Bias?*, 3 IEEE Transactions on Biometrics, Behavior, and Identity Science, 1, 101 (2021), https://arxiv.org/pdf/1912.07398.pdf.; Joy Buolamwini & Timnit Gebru, *Gender Shades: Intersectional Accuracy Disparities in Commercial Gender Classification*, 81 Proceedings on Machine Learning Research 77, 79 (2018); GEORGETOWN LAW CTR. ON PRIVACY & TECH, THE PERPETUAL LINE-UP: UNREGULATED POLICE FACE RECOGNITION IN AMERICA 54 (2016), https://www.perpetuallineup.org/.; PATRICK GROTHER, MEI NGAN & KAYEE HANOAKA, NAT'L INST. STANDARDS & TECH., INTERNAL REP. 8280, FACE RECOGNITION VENDOR TEST (FRVT) PART 3: DEMOGRAPHIC EFFECTS 3 (2019).

be misidentified by facial recognition systems than white men.[9]

77.

Facial recognition systems operate by analyzing the structure and details of faces to generate "faceprints" — i.e., unique digital codes corresponding to each face — and attempting to match different images of the same face using those faceprints. Because facial recognition systems function by discerning detail, misidentifications are particularly likely when the image of the face sought to be identified — the "probe image" — is not sufficiently visible and clear.

78.

To operate the facial recognition technology, a user inputs the probe image into the system in hopes of finding a match. Once inputted, the system will create a faceprint by analyzing the probe image according to an "algorithm" — a set of logical steps, operationalized through computer code, that the system follows to achieve its task of identifying the individual.

79.

Once a probe image is fed into the system, the system compares the

---

[9] *See* Steve Lohr, *Facial Recognition Is Accurate, if You're a White Guy*, N.Y Times (Feb. 9, 2018), https://www.nytimes.com/2018/02/09/technology/facial-recognition-race-artificial-intelligence.html; Nat'l Inst. of Standards & Tech., *NIST Study Evaluates Effects of Race, Age, Sex on Face Recognition Software* (Dec. 19, 2019),https://www.nist.gov/news-events/news/2019/12/nist-study-evaluates-effects-race-age-sex-face-recognition-software.

faceprint it generates from the probe image to a database of already- generated faceprints of other images and produces an output. The form of the output varies from system to system, but potential matches are typically assigned a likelihood score representing the algorithm's confidence in a match to the face depicted in the probe image.

80.

Because facial recognition systems are inherently probabilistic (meaning they cannot say with certainty that two different images are or are not a match), they typically display a list of possible matches, organized in order of the algorithm's confidence in a match.

81.

In part, because of errors in the algorithms and variations in the data they process, and in part because the output will often include several individuals with varying associated probability scores, search results are not to be considered positive identifications. The facial recognition technology is not designed to assert that the first-returned result, nor any of the returned results, is an actual match. Using facial recognition systems involves risk of error, which in the law enforcement context, has grave consequences for the misidentified individual.

82.

Due to widespread public scrutiny of the technology and its various flaws, there has been an increasing awareness that facial recognition systems are inaccurate and dangerous. A growing number of jurisdictions have officially recognized the dangers of facial recognition systems in policing. Since 2019, at least 20 cities in the United States have banned their police departments from using facial recognition systems, including San Francisco, Boston, New Orleans, Minneapolis, and Jackson, Mississippi.[10]

83.

Despite facial recognition technology's well-known flaws and other jurisdictions' regulation of its use, the Jefferson Parish Sheriff's Office use of facial recognition technology does not offer quality control standards, ensure peer review, or offer detectives adequate training.

---

[10] Fight for the Future, Ban Facial Recognition, https://www.banfacialrecognition.com/map/ (last accessed Mar. 11, 2021); Kate Conger et al., San Francisco Bans Facial Recognition Technology (May 14, 2019),
N.Y. TIMES, https://www.nytimes.com/2019/05/14/us/facial-recognition-ban-san- francisco.html; Ally Jarmanning, Boston Lawmakers Vote to Ban Use of Facial Recognition Technology by the City (June 24, 2020), NPR, https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/06/24/883107627/boston-lawmakers-vote-to-ban-use-of-facial-recognition-technology-by-the-city; Kayode Crown, Jackson Bans Facial Recognition Tech (Aug. 20, 2020), https://www.jacksonfreepress.com/news/2020/aug/20/jackson-bans-facial- recognition-tech-new-airport-a/; Ally Jarmanning, Boston Bans Use of Facial Recognition Technology. It's the 2nd-Largest City to Do So, WBUR (June 24, 2020), https://www.wbur.org/news/2020/06/23/boston-facial-recognition-ban.

## JPSO HAS NO POLICIES AND TRAINING ON USE OF FACIAL RECOGNITION TECHNOLOGY

84.

Following the arrest and release of MR. REID, Deputy Chief Dax Russo of JPSO wrote an email to Defendant LOPINTO explaining the events that led to MR. REID'S arrest, detention, and the recall of his arrest warrant, after JPSO was contacted by MR. REID'S attorney.  See *Email from Dax Russo, January 3, 2023,* attached hereto as **Exhibit 22**.

85.

According to Deputy Chief Russo's email, JPSO officers were informed of the limitations and intended use of facial recognition technology by JPSO.

> When facial recognition was first available to CIB personnel, they were informed that this is another investigative tool and supporting evidence or investigative leads need to be developed prior to having an arrest warrant issued. Since this has been brought to my attention, I have met with all the Division Commanders concerning this matter and have reiterated the criteria that needs to be met before any warrant is authored.  They have met with all of their supervisors and personnel where they reiterated the function of facial recognition and that additional evidence or leads needs to be developed prior to a warrant being issued.

*Id.*

86.

Defendant LOPINTO allowed his officers to use and rely on identifications

obtained from facial recognition technology in support of criminal arrest warrants, without providing adequate guidelines and training to his officers on the necessity of conducting further investigation to support a positive identification of a suspect based on facial recognition technology.[11]

87.

Defendant LOPINTO has failed to establish a policy and training for the use of facial recognition technology that establishes and requires investigating officers to ensure that minimum photo quality standards are used when relying on facial recognition technology, such as pixel density and the percent of the face that must be visible in the original photo. *Id.*

88.

Defendant LOPINTO has failed to establish a policy or training that mandates and addresses specific and concrete guidelines to investigate officers regarding what evidence constitutes sufficient corroboration of a possible match generated by facial recognition technology, before any law enforcement action is taken against a suspect, including the application for a criminal arrest warrant. *Id.*

89.

Defendant LOPINTO has failed to establish a policy and training that

---

[11] Clare Garvie, *Garbage In, Garbage Out*, Center on Privacy & Technology at Georgetown Law (May 16, 2019).

prohibits the use of facial recognition as a positive identification under any circumstances, especially as in this case, where the manufacturer of the technology, Clearview AI warns as follows:

- CV makes no guarantees as to the accuracy of its search-identification software.

- The Client must conduct further research in order to verify identities or other data generated by the CV system.

- CV is neither designed nor intended to be used as a single-source system for establishing the identity of an individual.

- Furthermore, CV is neither designed nor intended to be used as evidence in a court of law.

See *Clearview AI, Service Agreement, User Guidelines*, attached hereto as **Exhibit 3**.

## MR. REID'S DETENTION
## AT DEKALB COUNTY JAIL

90.

Following MR. REID'S arrest, he was transported and booked into the DeKalb County jail, where he remained locked up for six days, from November 25, 2022, through December 1, 2022.

91.

The extradition paperwork submitted to DeKalb County jail required that

MR. REID be held until he was picked up by Louisiana officers to be taken to Jefferson Parish. <u>See</u> *Document from Jefferson Parish Sheriff's Office, Extradition/Fugitive Section*, attached hereto as **Exhibit 23**.

92.

During his detention, MR. REID'S family retained the services of a criminal defense lawyer from Louisiana, who obtained photos and videos of MR. REID that he presented to the Jefferson Parish Sheriff's Office on November 30, 2022.

93.

After being presented with the photos and video of MR. REID, the Jefferson Parish Sheriff's Office notified MR. REID'S criminal defense attorney that they were withdrawing the warrant, supposedly because they noticed a mole on MR. REID'S face that the purse thief did not have.[12]

94.

The photos showed that Mr. Reid has many distinct differences from the suspect from the Second Act theft. The suspect is 30-40 pounds heavier than Mr. Reid. Mr. Reid also has a mole on his face. Mr. Reid also has a darker skin tone than the suspect.

---

[12] *See* Kashmir, supra note 1.

95.

On November 30, 2022, Judge Patricia Joyce of the 24th Judicial District Court of Jefferson Parish signed a *Request for Recall of Arrest Warrant*, submitted by Sergeant Randy Thibodeaux, which stated as follows: **"After further investigation, it was learned Randal Reid was not involved in the crimes committed."** See *Request for Recall of Arrest Warrant*, attached hereto as **Exhibit 24**. (emphasis added).

96.

Defendant LOPINTO stated to the media that MR. REID'S detainment was "unfortunate by all means" and "[a]s soon as we realized it wasn't him, we moved mountains in order to get him out of jail." [13]

97.

MR. REID suffered constant mental and emotional distress from being detained at the jail and was barely able to eat or sleep. He also experienced significant anxiety based on a concern that he would lose his transportation analyst job and be convicted of felony crimes that he did not commit.

98.

After his release from the DeKalb County jail, MR. REID went to the

---

[13] *See* Kashmir, supra note 1.

emergency room at Piedmont Hospital in Atlanta, where he was treated for salmonella gastroenteritis, which was caused by the food he ate during his incarceration at the jail.

99.

As a result of his wrongful arrest and detention, MR. REID incurred expenses for his car being towed from the highway where he was arrested; he was forced to use leave to excuse his missed time from work; medical expenses for treatment at the emergency room for food poisoning; and he had to pay a criminal defense attorney in Louisiana to secure his release from jail.

## STATEMENT OF CLAIMS

## COUNT I

## False Arrest and Imprisonment in Violation of the Fourth Amendment

## (Defendant BARTHOLOMEW)

100.

Plaintiff hereby incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

101.

Pursuant to 42 U.S.C. § 1983, every person acting under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, who subjects, or

causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

### 102.

The Fourth Amendment to the United States Constitution guarantees the right of the people "to be secure in their persons … against unreasonable … seizures" and demands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."

### 103.

At all relevant times, Defendant BARTHOLOMEW was a state actor acting under the color of law and pursuant to JPSO policies, customs, and practices.

### 104.

It was clearly established at the time of MR. REID'S arrest that the Fourth and Fourteenth Amendments prohibit state actors from arresting or causing the arrest of individuals without probable cause and based on false and misleading information.

### 105.

Probable cause or reasonable cause exists when the facts and circumstances within the arresting officer's knowledge, and of which he has reasonably

trustworthy information, are sufficient to justify an average man of caution in the belief that an offense has been committed.

107.

In providing that warrants may only be issued upon probable cause; the Fourth Amendment requires that the investigating officer present their evidence in good faith and under oath. Consequently, the law clearly is clearly established that an officer who obtains a warrant under false pretenses violates the constitutional rights of the individual against whom that warrant is issued.

107.

Applying clearly established law, an objectively reasonable officer in Defendant BARTHOLOMEW'S position would have known that they did not have probable cause to seek an arrest warrant against MR. REID based solely on an identification of MR. REID resulting from the use of facial recognition technology.

108.

Applying clearly established law, an objectively reasonable officer in Defendant BARTHOLOMEW'S position knew, or should have known, that an identification based solely on facial recognition technology was not reliable for establishing the identify of a suspect; that further investigation was needed to

support the identification of MR. REID; and that the facial recognition software he used to identify MR. REID was not intended or designed to be used as evidence in a court of law to establish the identity of a suspect.

109.

Defendant BARTHOLOMEW obtained an arrest warrant for MR. REID by knowingly, willfully, and recklessly misrepresenting and concealing in his criminal arrest warrant affidavit the nature of the facial recognition result as probable cause.

110.

By failing to identify and describe the use of facial recognition technology to identify MR. REID, Defendant BARTHOLOMEW knowingly, willfully, and recklessly deceived the magistrate who ultimately signed a warrant for MR. REID'S arrest and extradition.

111.

By knowingly, willfully, and recklessly misrepresenting and omitting critical facts from his criminal arrest warrant affidavit, Defendant BARTHOLOMEW deprived the magistrate of critical evidence that would have been considered in determining whether there was probable cause to arrest MR. REID.

112.

By knowingly, willfully, and recklessly misrepresenting and omitting critical

facts from his criminal arrest warrant affidavit, Defendant BARTHOLOMEW induced the magistrate to sign the warrant authorizing MR. REID'S arrest and extradition to Louisiana, and therefore deprived MR. REID of his rights guaranteed by the Fourth Amendment.

113.

By knowingly, willfully, and recklessly misrepresenting and omitting critical facts from his criminal arrest warrant affidavit, Defendant BARTHOLOMEW deprived the magistrate of truthful information necessary to make an independent and informed decision regarding probable cause to arrest MR. REID.

114.

Defendant BARTHOLOMEW'S knowing, intentional and reckless omissions of material information from his criminal arrest warrant affidavit was a substantial, essential, and motivating factor in the magistrate's decision to issue a warrant for MR. REID'S arrest.

115.

As a direct and proximate result of Defendant BARTHOLOMEW'S false and misleading criminal arrest warrant affidavit, which induced a magistrate to sign a warrant for MR. REID'S arrest, MR. REID is entitled to recover general, compensatory, and special damages for his wrongful arrest and incarceration.

# COUNT II

## Federal and State Malicious Prosecution

## (Defendant BARTHOLOMEW)

116.

Plaintiff hereby incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

117.

Under Georgia law, a criminal prosecution, maliciously carried out and without any probable cause that which damages the person prosecuted shall give that person a cause of action. See O.C.G.A. § 51-7-40.

118.

The elements of a malicious prosecution claim under Georgia law are as follows: (1) prosecution for a criminal offense; (2) under a valid warrant, accusation or summons; (3) termination of the prosecution of the prosecution in favor of the plaintiff; (4) malice in the institution or maintenance of the proceedings; (5) lack of probable cause for the proceedings; and (6) damages to the plaintiff. See *Wal-Mart Stores, Inc. v. Blackford*, 264 Ga. 612 (1994).

119.

To establish a federal claim of malicious prosecution under Section 1983, a plaintiff must prove (1) the elements of the tort of malicious prosecution, and (2) violation of her Fourth Amendment right to be free from unreasonable seizures. See *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th. Cir. 2004).

120.

At the time Defendant BARTHOLOMEW submitted an affidavit in support of the arrest of MR. REID, the law was clearly established that the Fourth Amendment required that warrants may only be issued based on probable cause, and that an investigating officer present evidence in support of an arrest warrant in good faith.

121.

Defendant BARTHOLOMEW obtained an arrest warrant for MR. REID by knowingly, willfully, and recklessly misrepresenting and concealing in his criminal arrest warrant affidavit the evidence offered to the Court in support of probable cause.

122.

Defendant BARHTOLOMEW knew, or should have known, that an identification of MR. REID based solely on facial recognition technology was not reliable to establish probable cause to seek an arrest warrant against MR. REID.

123.

The arrest and prosecution of MR. REID was instigated with malice and without probable cause based on Defendant BARTHOLOMEW depriving the magistrate of truthful information necessary to make an independent and informed decision regarding probable cause to arrest and charge MR. REID with felony crimes of bank fraud and identity theft.

124.

The arrest and seizure of MR. REID, which led to his prosecution, resulted from a violation of his Fourth Amendment rights to be free from an unreasonable seizure, which occurred without legal justification, and based on false misleading allegations made by Defendant BARTHOLOMEW.

## **COUNT III**

### *Monell* and Supervisory Liability for False Arrest and Imprisonment, and Malicious Prosecution in Violation of the Fourth Amendment

### **(Defendant LOPINTO)**

125.

Plaintiff hereby incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

126.

A municipality or other local government body is liable under 42 U.S.C. § 1983 if the governmental body itself subjects a person to a deprivation of rights, or "causes" a person to be subjected to such deprivation. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 692 (1978). A municipality causes a deprivation of rights when its official policy is the "moving force" resulting in the deprivation of constitutional right. *Id.*, at 694.

127.

 Although there is no liability under 42 U.S.C. § 1983 based on respondeat superior, a supervisor can be held liable under Section 1983 when they implement or fail to implement policies, training, and supervision that is so deficient that it is the moving force resulting in the deprivation and violation of an individual's constitutional rights.

128.

An official municipal policy can be demonstrated by a widespread practice of city or local government officials or employees, which, although not authorized

by an officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. See *City of Proprotnik*, 485 U.S. 121 (1988).

129.

A municipality or other local government can be held liable for an unlawful custom when officials with policy making authority have actual or constructive knowledge of the custom.

130.

The failure to supervise or train officers who violate a plaintiff's rights can amount to an official policy where a final policymaker has "sufficient notice" that a failure to supervise or train is likely to lead to constitutional violations. See *Canton v. Harris*, 489 U.S. 378, 390 (1989).

131.

While under Louisiana law, JPSO is not an entity capable of being sued, Defendant LOPINTO, as the Sheriff of JPSO can be sued in his official capacity as the chief law enforcement officer for Jefferson Parish who is responsible for training, supervision, administration, policies, customs, practices, operations, management, and control of JPSO and its officers, including Defendant BARTHOLOMEW. See *Causey v. Parish of Tangipahoa*, 167 F. Supp. 2d 898,

904 (E.D. La. 2001).

132.

Defendant LOPINTO was aware of the obvious need for JPSO to have reasonable policies, training, and supervision regarding the use of facial recognition software in support of criminal arrest warrants, and was aware that the failure to provide policies, training, and supervision to JPSO officers in this regard, including Defendant BARTHOLOMEW, posed a significant risk of the constitutional rights of citizens being violated due to arrest based on misidentifications from the use of facial recognition technology.

133.

Defendant LOPINTO was the final policymaker for the JPSO in the areas of law enforcement, policies, training, and supervision, and thus is liable in his official capacity for the unlawful JPSO policies and customs.

134.

The arrest of a suspect based on the use of facial recognition technology in a criminal arrest warrant affidavit is the type of situation in which citizens are at a significant of their constitutional rights being violated if adequate policies and procedures are not in place, and if officers are not adequately trained and supervised on the limitations and proper use of facial recognition technology.

135.

MR. REID'S misidentification from by facial recognition technology, and his resulting arrest based on that misidentification, was the predictable consequence of Defendant LOPINTO'S failure to have adequate policies and procedures in place at JPSO regarding the use of facial recognition technology.

136.

MR. REID'S misidentification from by facial recognition technology, and his resulting arrest based on that misidentification, was the predictable consequence of Defendant LOPINTO'S failure to provide adequate training and supervision to JPSO officers on the limitations and proper use of facial recognition technology.

137.

MR. REID was injured and had his Fourth Amendment right to be free of unreasonable seizures violated because JPSO failed to establish adequate policies, failed to train officers, and exhibited a custom of acquiescence regarding deficient facial recognition practices.

138.

The flaws and weaknesses in facial recognition technology were well known

at the time JPSO began using facial recognition technology, including specific warnings from Clearview AI, the owner of the facial recognition technology used by JPSO.

139.

Despite the specific warnings of Clearview AI, as well as publicly known flaws of facial recognition technology, Defendant LOPINTO was deliberately indifferent to the use of facial recognition technology by his officers, as shown by his failure to establish adequate policies governing the use of facial recognition; failing to train his officers regarding the limitations and proper use of facial recognition technology; and by exhibiting a custom of acquiescing to his officer's use and reliance on facial recognition technology.

140.

Defendant LOPINTO was on actual or constructive notice that JPSO officers were using and relying on facial recognition technology as the sole basis for identifying suspects and were relying on identifications obtained in this manner in support of criminal arrest warrants submitted to neutral magistrates.

141.

Defendant LOPINTO knew, must have known, or should have known that the use of facial recognition technology by JPSO officers, including Defendant

BARTHOLOMEW, was a practice and custom that would likely lead to the arrest of a citizen in violation of their constitutional rights protected by the Fourth Amendment.

142.

Defendant LOPINTO permitted, encouraged, tolerated, and knowingly acquiesced to JPSO officers, including Defendant BARTHOLOMEW, using, and relying on facial recognition technology as described herein,

143.

Defendant LOPINTO condoned, approved, ratified, facilitated, and knowingly acquiesced in the actions of his JPSO officers, including Defendant BARTHOLOMEW, misuse, and reliance on facial recognition technology.

144.

Defendant LOPINTO'S actions and omissions as it relates to taking any corrective action to address the above-described policies, practices, and customs, demonstrates a deliberate indifference by him to the constitutional rights of citizens guaranteed by the Fourth Amendment, and in the case of MR. REID, was the moving force behind his false arrest and imprisonment, and malicious prosecution.

145.

Defendant LOPINTO knew or should have known that an identification

based solely on facial recognition technology does not establish probable cause; and he knew or should have known that JPSO officers were using and relying on identifications from Clearview AI in support of criminal arrest warrant affidavits, despite warnings from Clearview AI that its technology was not designed nor intended to be used as a single-source system for establishing the identity of an individual, nor designed nor intended to be used as evidence in a court of law.

146.

Because of the deliberate indifference of Defendant LOPINTO, as described above, Defendant BROTHOLOMEW was allowed to submit a criminal arrest warrant affidavit to a magistrate that contained false and misleading information, and which failed to identify the use of facial recognition technology as the sole means of identifying MR. REID.

147.

As a direct and proximate result of the indifference of Defendant LOPINTO, as described above, MR. REID'S Fourth Amendment rights were violated, thus entitling him to recover general, compensatory, and special damages.

## COUNT IV

**False Arrest and Imprisonment in Violation of
Louisiana Civil Law**

**(Defendant BARTHOLOMEW)**

148.

Plaintiff hereby incorporate by reference all other paragraphs of this complaint as if fully set forth herein.

149.

Under Louisiana law, probable cause is required to justify the arrest of an individual, and the tort of false imprisonment or arrest occurs when there is an unlawful detention of a person without probable cause to justify their detention.

150.

There was no probable cause that MR. REID committed a crime justifying his arrest pursuant to the criminal arrest warrant filed by Defendant BARTHOLOMEW.

151.

Defendants BARTHOLOMEW obtained an arrest warrant that relied solely and totally upon an erroneous and false identification of MR. REID from flawed facial recognition technology.

152.

Defendants BARTHOLOMEW made no efforts to verify the identification, even where verification of facial recognition identification is necessary to establish probable cause.

153.

Moreover, Defendant BARTHOLOMEW knowingly or recklessly misrepresented and omitted information in the affidavit that was material to the magistrate's decision to issue an arrest warrant for MR. REID.

154.

Defendant BARTHOLOMEW'S false statements and omissions led to the intentional, willful, and wrongful arrest of MR. REID.

155.

Defendant BARTHOLOMEW'S false statements and omissions directly and proximately caused injury to MR. REID that entitles him to recover general and compensatory damages.

## COUNT V

**Intentional Infliction of Emotional Distress in
Violation of Louisiana Civil Law**

**(Defendant BARTHOLOMEW)**

156.

Plaintiff hereby incorporate by reference all other paragraphs of this complaint as if fully set forth herein.

157.

The extreme and outrageous conduct of Defendant BARTHOLOMEW, as

set forth herein, caused MR. REID to suffer severe emotional distress.

158.

As a direct and proximate, foreseeable result of the Defendant BARTHOLOMEW'S egregious false statements and omissions, and his deliberate indifference to how this information would be used by a judge and law enforcement in Georgia, MR. REID suffered injuries, including mental pain and suffering, emotional distress, fear, humiliation, and the loss of enjoyment of life.

## COUNT VI

**Negligence in Violation of Louisiana Civil Law**

**(Defendants BARTHOLOMEW and LOPINTO)**

159.

Plaintiff hereby incorporate by reference all other paragraphs of this complaint as if fully set forth herein.

160.

Under Louisiana law, to prevail on a negligence claim, a plaintiff must prove that: (1) defendant had a duty to conform his conduct to a specific standard (duty);' (2) defendant failed to conform his conduct to a specific standard (breach of duty); (3) defendant's conduct was the cause-in-fact of plaintiff's injuries (cause-in-fact); (4) defendant's conduct was the legal cause of plaintiff's injuries (the risk of harm

caused to plaintiff was within the scope of protection afforded by the duty); and (5) plaintiff incurred actual damages (damages). See *Parker v. Town of Woodworth*, 160 So. 3d 1113, *1129 (La. App. 3 Cir. 03/04/15).

161.

A police officer has a duty to perform his function with due regard for the safety of all citizens who will be affected by his action and must always exercise his duty in a reasonable fashion and as a reasonably prudent person under the circumstances.  See, Id., (citations omitted).

162.

Defendants BARTHOLOMEW and LOPINTO had a duty as enforcement officers to conduct their affairs in a manner which would avoid subjecting others to unreasonable risk of harm, including the risk of a citizen's rights under the Fourth Amendment being violated.

163.

At all times relevant, Defendants BARTHOLOMEW and LOPINTO had a duty to take reasonable measures to prevent the false arrest and detention of MR. REID but breached their duty by using and relying on facial racial technology as the sole basis for obtaining an arrest of MR. REID.

164.

As shown herein, Defendants BARTHOLOMEW and LOPINTO failed to take reasonable measures to protect the constitutional rights of MR. REID by failing to follow reasonable investigative procedures, including the omission and concealment of the use of facial recognition technology to identify MR. REID.

165.

As a direct and proximate result of the actions and omissions of Defendants BARTHOLOMEW and LOPINTO, a neutral magistrate was induced into issuing a criminal arrest warrant for MR. REID, which also required that MR. REID be held without bond for extradition to Louisiana.

## <u>COUNT VII</u>

**Negligent Training and Supervision in Violation of Louisiana Civil Law**

**(Defendant LOPINTO)**

166.

Plaintiff hereby incorporate by reference all other paragraphs of this complaint as if fully set forth herein.

167.

Defendant LOPINTO, as the sheriff and chief law enforcement officer for Jefferson Parish, owed a duty to MR. REID to properly train and supervise his

officers, including Defendant BARTHOLOMEW.

168.

For the reasons shown herein, Defendant LOPINTO breached his duty to train and supervise Defendant BARTHOLOMEW by failing to create and implement adequate policies and procedures regarding the use of facial recognition technology; and by failing properly train and supervise Defendant BARTHOLOMEW on the proper use and reliance on facial recognition technology in support of a criminal arrest warrant.

169.

As a direct and proximate result of Defendant LOPINTO failure to adequately train and supervise JPSO officers regarding the use of facial recognition technology, MR. REID was arrested and incarcerated based on his incorrect identification resulting from the use of facial recognition technology by Defendant BARTHOLOMEW.

**COUNT VIII**

**Vicarious Liability for False Arrest Under Louisiana Law**

**(Defendant LOPINTO, in his Official Capacity)**

170.

Plaintiff hereby incorporate by reference all other paragraphs of this

complaint as if fully set forth herein.

171.

Under Louisiana law, an employer will be liable for the tortious conduct of its employee where the employee is acting within the course and scope of his employment. See *Parker v. Town of Woodworth*, 160 So. 3d 1113, *1128-29 (La. App. 3 Cir. 03/04/15). An employee's conduct is within the course and scope of their employment if the conduct is connected in time, place, and causation to his employment-related duties.  *Id.*

172.

Defendant BARTHOLOMEW was acting within the course and scope of his employment when he prepared and submitted a criminal arrest warrant affidavit to a magistrate identifying MR. REID as a suspect.

## **DAMAGES**

173.

Plaintiff hereby incorporate by reference all other paragraphs of this complaint as if fully set forth herein.

174.

As a direct and proximate result of his wrongful arrest and incarceration, MR. REID has suffered and continues to suffer, great pain of mind, shock,

emotional distress, physical manifestations of emotional distress, embarrassment, disgrace, humiliation, and loss of enjoyment of life.

175.

As a direct and proximate result of the above-described conduct, MR. REID is entitled to recover general damages for loss of enjoyment of life, mental anguish, and emotional pain and suffering – past, present, and future.

176.

As a direct and proximate result of the above-described conduct, MR. REID incurred expenses associated with his wrongful arrest and incarceration and is entitled to recover special damages for past lost wages, medical expenses, towing expenses, and legal expenses.

**WHEREFORE**, Plaintiff, RANDAL QURAN REID prays for a judgment against Defendants as follows:

a)   That process issue and that Defendants be served according to the law;

b)   That Plaintiff have a trial by jury;

c)   That Plaintiff have and recover a verdict and judgment against Defendants, jointly and severally, for all compensatory and general damages, and for attorney fees pursuant to 42 U.S.C. § 1988, and for

all such amounts as may be proven before the trier of fact; and

d)      That Plaintiff have such other and further relief as this Court deems

just and proper under the circumstances.

Respectfully submitted this 8th day of September, 2023.

THE COCHRAN FIRM – ATLANTA

/s/ Samuel L. Starks
Shean D. Williams, Esq.
Georgia Bar No. 764139
Samuel L. Starks, Esq.
Georgia Bar No. 676515
Gary Andrews, Esq.
Georgia Bar No. 019299
swilliams@cochranfirmatl.com
sstarks@cochranfirmatl.com
gandrews@cochranfirmatl.com
*Attorneys for the Plaintiff*

100 Peachtree Street, NW
Suite 2600
Atlanta, Georgia 30303
Telephone: (404) 222-9922
Fax: (404) 222-0170
swilliams@cochranfirmatl.com
sstarks@cochranfirmatl.com
gandrews@cochranfirmatl.com